CINCINNATI, HAMILTON & DAYTON RAILWAY CO. v. BERDAN & CO.

1. PRIVATE SHIPPING RECEIPT—CONDITIONS OF BILLS OF LADING.

Where a shipper delivers goods to a railway company in cars loaded and sealed by himself, and, for his own convenience, upon shipping receipts prepared by himself, but conditioned that the goods were received " subject to conditions contained in the company's regular bill of lading," and has an opportunity to see the bill of lading if he wishes, he is bound by the valid conditions in such regular bill of lading, whether he knows them or not.

2. VALID CONDITION LIMITING COMMON LAW LIABILITY.

A condition in a bill of lading limiting the railway company's common law liability, in respect to loss by fire, to fires caused by its own negligence, is not against public policy nor invalid.

3. JUDGMENT NOTWITHSTANDING VERDICT.

In an action against a railroad company for the value of goods received upon condition limiting the carrier's liability in case of loss by fire to fires occasioned by its own negligence, a special finding by the jury that the fire did not result from the negligence of the railway company entitles the defendant to a judgment notwithstanding general verdict in favor of plaintiff.

Lucas Circuit Court.

HEARD ON ERROR.

*Swayne, Hayes & Tyler*, for plaintiff in error.

*Ralph S. Holbrook*, for defendant in error.

HULL, J.

This action was brought by defendant in error against the plaintiff in error to recover for the loss of a car of glass jars that was delivered to the Big Four railroad company, so-called, at Muncie, Indiana, the Big Four railroad company there taking the fruit jars for shipment to Toledo over its own line and the Cincinnati, Hamilton & Dayton railway, thus making a continuous line from Muncie to Toledo, and the Cincinnati, Hamilton & Dayton Railway Company being bound by the contract of shipment, between the shipper at Muncie, Indiana, and the Big Four railroad company. The fruit jars were manufactured and shipped by the Ball Brothers Glass Manufacturing Company of Muncie, Indiana, to Berdan & Co., who became the owners of them when they were placed on board the cars. They were transported from Muncie to the city o Toledo, and after reaching Toledo, when they were in the yards of the Cincinnati, Hamilton & Dayton Company, they were burned, the fire originating in the warehouse of the Michigan Central Railroad Company and being communicated to the car in which these fruit jars were at the time. The car load of merchandise being thus destroyed, Berdan & Co. brought action against the Cincinnati, Hamilton & Dayton Railway Company upon its common law liability as a common carrier, alleging that these fruit jars were delivered to the railroad company for transportation and that they had not delivered to them according to their contract, and they therefore asked damages for their value, to-wit, $587.50. The case was tried in the court of common pleas and the jury returned a verdict against the railroad company for the full amount named, with interest, and judgment was entered thereon, and it was to reverse this judgment that this proceeding in error was brought here.

The question in the case is, whether any contract was made between the Ball Brothers Glass Manufacturing Company and the railroad company limiting the common law liability of the railroad company, the railroad company claiming that there was such a contract made and entered into with the shipper, and that Berdan & Co, standing in its place, are, by the facts of the case, estopped from denying that such a contract was made. The plaintiff, on the other hand, denies that there was such a contract made, limiting the common law liability of the railroad company, and claim and aver that if such a contract was made, it was void, illegal and contrary to public policy. The petition sets forth succinctly and briefly the delivery of these goods to the railroad company for shipment from Muncie, Indiana, to Toledo, and that the goods were not delivered to the plaintiff, but were lost by the default of the defendant, and asks judgment for their value.

The answer contains two causes of defense. In its first cause of defense the railroad company pleads the special contract to which I have referred and which it claims was entered into between the shipper at Muncie, Indiana, and the Big Four railroad company. They say in their answer that:

"On June 21, 1899, Ball Brothers Glass Manufacturing Company and said The Cleveland, Cincinnati, Chicago & St. Louis Railway Company entered into a certain contract, wherein and whereby said Ball

Brothers Glass Manufacturing Company delivered to said The Cleveland, Cincinnati, Chicago & St. Louis Railway Company, at said city of Muncie, 800 cases pint glass fruit jars, 1,200 cases quart fruit jars and 300 cases half-gallon fruit jars, for transportation to said plaintiff at said city of Toledo, and wherein and whereby said railway company, in consideration of the sum of $31.10 thereafter to be paid it, did agree to carry said goods to said city of Toledo, and there deliver the same to said plaintiff, if said city of Toledo were on its line of railway, otherwise to deliver the same to another carrier on the route to said destination."

And the answer then avers:

" By said contract it was mutually agreed by and between said Ball Brothers Glass Manufacturing Company and said The Cleveland, Cincinnati, Chicago & St. Louis Railway Company that, as to each party, at any time interested in all or any of said property, and as to each carrier of all or any of said property, over all, or any portion of said route to said destination, every service, to be performed thereunder, should be subject to all the conditions therein contained, which were thereby agreed to by said Ball Brothers Glass Manufacturing Company, and accepted for itself and its assigns as just and reasonable.

" Said contract contained certain conditions and provisions whereby, and it was thereby, among other things, expressly agreed, by anb between said Ball Brothers Glass Manufacturing Company and said The Cleveland, Cincinnati, Chicago & St. Louis Railway Company, that any carrier or party, in possession of all or any of said property, should not be liable for any loss thereof or damage thereto, by causes beyond its control, or by floods or by fire. * * * "

This last provision referring to loss by fire is the one that is counted upon here by the railroad company exempting and excusing it, as it is claimed, for all loss by fire, not due to its own negligence, these goods having been destroyed, as it is conceded and as the evidence shows, by fire. The answer then proceeds to allege that these goods were delivered to the railway company and by it received for transportation to Toledo, subject to the terms and conditions of said contract; that they were transported to the city of Toledo and shortly after arrived; that while still in the car and standing on tracks in the city of Toledo, this fire occurred and these goods were burned up, without any fault or negligence on the part of the railroad company.

For their second defense, after setting forth that such a contract was made between the shipper—which would also bind Berdan & Co.—and the railroad company, they plead an estoppel growing out of the facts as they claim them in the case, claiming that Berdan & Co., if they did not expressly agree to these conditions which were in the bill of lading, are estopped by the conduct of the shipper, and by the facts, from denying that such agreement was entered into; and they say, in the second cause of defense :

" On June 21, 1899, and continuously for a long time prior thereto, Ball Brothers Glass Manufacturing Company was engaged in the manufacture of glass jars at the city of Muncie in the state of Indiana and said The Cleveland, Cincinnati, Chicago & St. Louis Railway Company was engaged in the transportation of freight from said city for said manufacturing company.

" On said date, and continuously for a long time prior thereto, there was in use a certain custom adopted by, known to, and acquiesced in by said manufacturing company and said railway company, whereby, when-

ever said manufacturing company desired to transport freight from said city of Muncie over the line of railway of said railway company, said manufacturing company should load said freight into a car, should seal and tender the same to said railway company, together with a certain writing, prepared by said manufacturing company, containing a description of said car and the contents thereof, the destination of the same, to whom to be delivered, the rate to be charged therefor, and a statement that said freight should be transported subject to the conditions contained in said railway company's bill of lading; and thereupon said railway company should sign said paper writing, return the same to said manufacturing company, in lieu of its bill of lading, and accept and transport said freight subject to the conditions contained in said bill of lading.

"On said June 21, 1899, in accordance with said custom, said manufacturing company tendered said railway company, at Muncie, Indiana, a certain car, known and designated as "C. C. C. & St. L.," No. 9074," which had been loaded and sealed by said manufacturing company, and contained the freight described and set forth in the first cause of defense, and a certain paper writing wherein was set forth a description of said car, and the contents thereof to be delivered to said plaintiff, at Toledo, Ohio, in consideration of ten cents per hundred pounds to be paid therefor, and to be transported subject to the conditions contained in said railway company's bill of lading, by way of its line of railway and that of this defendant. Thereupon, and in accordance with said custom aforesaid, said railway company signed said writing and returned the same to said manufacturing company, in lieu of its bill of lading, accepted said freight and agreed to transport the same as in said paper writing directed; subject, however, to the conditions contained in its bill of lading.

"On said date, and for some time prior thereto, the bill of lading issued and used by said railway company contained, among others, certain conditions subject to which freight was accepted for transportation and which were, in substance, as follows, to-wit: That it was mutually agreed, in consideration of the rate of freight therein named, as to each carrier of all or any property, over all or any portion of said route to destination and as to each party at any time interested in all or any of said property that every service to be performed thereunder, should be subject to all the conditions therein contained, whether printed or written, and which were thereby agreed to by the shipper and by him accepted for himself and his assigns as just and reasonable, and that no carrier or party in possession of all or any of the property accepted for transportation, should be liable for any loss thereof or damage thereto by causes beyond its control, or by floods or by fire, and that the amount of any loss or damage to which any carrier became liable should be computed at the value of the property at the place and time of shipment," etc.

They then say that they received this property for shipment subject to these conditions in the bill of lading, and they say finally:

"By reason of the premises aforesaid said plaintiff is estopped from denying that the conditions contained in the bill of lading of said The Cleveland, Cincinnati, Chicago & St. Louis Railway Company were a part of the contract under and by virtue of which said freight was accepted by said railway company for transportation."

The plaintiff replied to the answer, denying that any such contract was made; and denying that it was estopped by any of the facts in the premises, and alleged further in an amendment to the reply, that if any such limitation was made that it was void.

The case came on for trial and the court of common pleas, after the evidence was, in left the question to the jury in the charge to say whether the shipper had agreed to the said conditions contained in the bill of lading or not, and the jury were charged that if they had so agreed, that if they had knowledge of these conditions contained in the bill of lading and agreed to them, that they would be bound thereby, but if they had not in fact agreed to it and in fact had no knowledge that it was contained in the bill of lading, that the shipper would not be bound thereby.

The jury returned a general verdict in favor of the plaintiff for the full amount. The jury, besides that, returned a special verdict, or, rather, answered three interrogatories, as follows:

" 1.   Was the fire by which the property described in the petition destroyed, occasioned by any negligence or want of care on the part of the defendant ?   Answer:   No.

" 2.   Was the defendant guilty of any negligence or want of care in putting the property described in the petition in the place it was, when destroyed by fire ?   Answer.   No.

" 3.   Could the defendant, by the exercise of the greatest care and diligence, after the fire was discovered, have prevented the loss and destruction of the property described in the petition ?   Answer:   No."

After the return of the general verdict the defendant below filed a motion for judgment notwithstanding the general verdict, claiming that it was entitled to a judgment upon the answers to the interrogatories. This motion being overruled, a motion for a new trial was filed, which was also overruled and judgment entered.

There is substantially no dispute, we may say none whatever, as to the facts in this case. The undisputed evidence shows that at the time in question Ball Brothers were engaged in the manufacture of glass at Muncie, Ind., and that on June 21, 1899, they loaded this car at their manufacturing establishment with this carload of merchandise and sealed it whereupon the employes of the manufacturing company delivered it to the railway company and at the same time delivered to it a shipping receipt, which is attached to the bill of exceptions marked Exhibit No. 1, and is in this language:

" Received in good order from Ball Brothers Glass Manufacturing Co., by the C. C. C. & St. L. Railway Co., the articles named below, to be delivered in like good order, without delay to Berdan & Co. at the station at Toledo, Ohio.   Subject to the terms and conditions of the R. R. Co.'s bill of lading.   Rate ten cents per 100 lbs. from Muncie to Toledo."

· Then there follows a description of the property.   This shipping receipt was signed by the agent of the railway company and returned to Ball Brothers Glass Manufacturing Company in lieu of a bill of lading.   For ten years it had been the custom of the company in making shipments to prepare shipping receipts for their own goods, the evidence showing that for ten years prior to this time these shipping receipts were prepared by the manufacturing company themselves, they having been informed by the railway company what form would be acceptable to the railway company, and what they would accept in lieu of issuing a regular bill of lad-

ing. The words: " Subject to the terms and conditions of the R. R. Co.'s bill of lading " were placed in this form by the manufacturing company because the railway company insisted upon this provision before they would accept such receipt in lieu of a regular bill of lading. At this time, when these goods were shipped and when they were delivered to the railway company with the shipping bill containing the language to which I have referred, the regular bill of lading of the railway company contained this provision : " No carrier or party in possession of all or any of the property herein described shall be liable for any loss thereof or damage thereto, by causes beyond its control ; or by floods or by fire," etc.

This form of a bill of lading has been in use by the railway company, for six or seven years before the date of this shipment. Under this state of facts, this method of shipment and this form of receipt this car of goods was delivered to the railway company by the Glass Manufacturing Company, the car being sealed by them and the shipping bill was receipted for by the railway company and returned to the manufacturing company and the car went on its way to Toledo and no other bill of lading was issued. The evidence shows that the car arrived at Toledo on June 25, some three or four days after it was received at Muncie, and, as I have said, very soon after that, was destroyed by fire.

The question in the case is, whether under this state of facts the shipper should be held, as a matter of law, to have agreed to this condition in the bill of lading ; or, if not, whether, under the facts, the shipper should be held to be estopped from denying that he had agreed to that condition.

It is well established that, in the absence of any agreement to the contrary a common carrier is liable for the loss of goods, whether by his own negligence or not, unless due to the act of God or to the public enemy ; but it is equally well settled in this state, that a common carrier may limit his common law liability by a fair contract, but he cannot limit or avoid his liability for his own negligence. The law is laid down in Graham & Co. v. Davis, 4 Ohio St. 362 [62 Am. Dec. 285], and in several other cases thereafter. The Supreme Court there say, in the syllabus :

" A common carrier, by special contract with the owner of goods intrusted to him, may so far restrict his common law liability as to exonerate himself from losses arising from causes over which he had no control, and to which his own fault or negligence in no way contributed."

It is also determined in this state that a shipper is bound by the conditions of a bill of lading which he accepts at the time of shipping the goods, although he does not sign the bill of lading or agree to it in writing, if it is signed by the railroad company and he accepts it. I refer to Cincinnati, H. & D. R. R. v. Pontius, 19 Ohio St., 221 [2 Am. Rep., 391] and I will read a paragraph from the syllabus :

" A bill of lading signed by the company's receiving agent, and accepted and acquiesced in by the consignor, is binding upon the latter, although not signed by him ; and the terms and conditions of the contract expressed therein cannot be contradicted by parol proof."

On page 237, the court say :

" The objection that the bill of lading was not signed by both parties is without validity. It is enough that it was signed by the company, and accepted and acquiesced in by the other party, and that there

was no fraud, deceit, or mistake accompanying the transaction. There are abundant authorities to this effect."

The general law on this question is discussed in the leading case of Gaines v. Trans. & Ins. Co., 28 Ohio St., 418, where the court say :

" A common carrier may limit his common law liability for losses happening to the goods without fault or negligence on his part by a special agreement fairly made by the parties.

" When a carrier claims exemption from such liability, under a bill of lading not signed by the owner or consignor of the goods, he must aver and prove that such bill was assented to by the shipper.

" Whether such assent has been given, so as to make the bill of lading binding on the shipper, is a fact to be proved, and cannot be implied or presumed contrary to the facts, when the acts of the shipper do not operate as an estoppel."

The answer in this case was drawn by counsel to meet the requirements of this decision and sets up two defenses : First, that the shipper agreed to the conditions of the bill of lading and assented thereto. Second, setting forth the facts, it is alleged, as a matter of law, that the shipper is estopped by the facts from denying that he agreed to the terms of the bill of lading.

The court charged the jury that :

" If Ball Bros. Co., when they prepared the shipping receipt, knew that the bill of lading then in use by the Big Four Co., contained a condition that the carrier was not liable for a loss by fire, then it was bound by that condition, and in preparing and tendering the shipping receipt containing those words, " subject to the terms and conditions of the railroad company's bill of lading," it would be regarded as assenting to that condition—if they knew that condition was in the company's regular bill of lading in use at that time. But if it is not shown by the evidence that Ball Bros. Co., knew that the bill of lading contained such a condition, then it cannot be regarded as assenting to it. No bill of lading having been issued in this case, there can be no assent to its terms and conditions, nor acquiescence in its terms and conditions, without knowledge. Whether or not Ball Bros. Co., knew of the conditions must be determined by you from all the facts and circumstances in the case. Under these rules you will consider and analyze and weigh all the evidence."

So that under the instructions to the jury to entitle the defendant to a verdict, it was necessary for the jury to find that the Ball Bros. company in fact, at the time of this shipment, knew that this condition was contained in the bill of lading at that time ; otherwise, as the court instructed the jury, they would not be bound by that condition.

The evidence in the case showed—the testimony of the officers of the Ball Bros. Company having been taken, including that of the president —that these shipping bills were prepared by their book-keeper, in their office, and were sent with the car when it was delivered to the railway company. The president of the company testified that he knew that the railway company issued bills of lading ; that they were issued to other customers, at Muncie, Indiana, and he says others made up their accounts on those bills of lading.

He is asked whether he ever read any of them, and he says : " I never read their bill of lading, and while I know there are copies of their bills of lading furnished to the shippers, on which they are supposed to

make out their account, yet, not having read it, I am not positive as to what it contains."

"Q. Referring, now, to Exhibit No. 1, I call your attention to the words, 'Subject to the terms and conditions of the R. R. Co.'s bill of lading,' and ask you if you know why or how those words happened to be inserted in that shipping receipt? A. I believe the railroad companies required that clause before they would accept it in place of their regularly printed sheet.

"Q. State, if you know, whether the railroad company will receive goods from you without that provision in the receipt, or without giving you a regular bill of lading? A. I don't know that we ever offered them goods, except in connection with their regular bill of lading or this substitute. This substitute was prepared after ascertaining what would be acceptable to the railroad company.

"Q. This shipping receipt is used, then, instead of the regular bill of lading, as I understand you? A. Yes, sir.

"Q. State, if you know, whether the railroad company requires either the regular bill of lading, or a shipping receipt similar to this? A. They do.

"Q. Before they will ship goods? A. They do.

"Q. You knew in 1899, and for some time before that, that the contracts made by railroad companies in the shipment of goods contained certain conditions, did you not? A. I knew that they contained conditions. I was not altogether familiar with all the conditions that they did contain.

"Q. You knew, however, that the railroad company would not accept this shipment for transportation except subject to the conditions contained in its bill of lading? A. Yes, sir.

"Q. Otherwise, as I understand, the company would have issued to you its regular bill of lading? A. Yes, sir."

So that it appears, uncontradicted, in the testimony, from the evidence of the officers of the Ball Brothers Glass Manufacturing Company, that they knew that the railway company issued bills of lading; that they had bills of lading; that they might have bills of lading if they desired them, or, if they preferred this way of shipping, they could send their shipping receipts to the railway company's office, and if they contained this provision they would be acceptable to the railway company, and this arrangement was adopted as a matter of convenience to the shipper as well as to the railway company, to avoid the necessity of procuring from the railway company a regular bill of lading before the goods were accepted.

There is no evidence in the record that there was any fraud about this on the part of the railway company or its officers; that there was any attempt to conceal from the shipper the conditions of the regular bill of lading which the evidence shows had been in use for about seven years at this time. And this provision limiting the railway company's liability against loss by fire, unless occasioned by its own negligence, is an ordinary condition in a bill of lading, and is not such a condition as would be against public policy or would be held, in our judgment, to be void for any reason, but such condition has been sustained by the courts. We hold that this condition in this l of lading, if it was binding upon Berdan & Co., was a valid condition so far as it limited the liability of the railway company to fire not occasioned by its own negligence.

The evidence in the case shows that the shipper knew that there were conditions in the regular bill of lading of the railway company; the Ball Brothers Company knew that they were not shipping these goods upon a common law contract, that there were some conditions in the bill of lading, for they are referred to in the shipping receipt which they used. The evidence shows that they might have seen the bill of lading if they had seen fit; that they might have had a regular bill of lading issued to them if they had desired, but they preferred this way and they signed and delivered to the railway company this written receipt, and the company accepted the goods for shipment upon these conditions, and upon that written proposition the goods were taken by the railway company for transportation to Toledo.

Now, in our judgment, whether the Ball Brothers Company, through their officers, had actual knowledge of this condition contained in the bill of lading or not, under these facts and circumstances, undisputed in the record, they are bound and were bound by this condition named in the bill of lading. Having made this written request to the railway company to ship their goods, knowing that they would not be accepted unless this provision was in the paper, knowing that this was in lieu of a regular bill of lading, knowing that they might examine the regular bill of lading if they saw fit, knowing of this requirement of the railway company, and that the goods were not being taken unconditionally by them, they are estopped from denying that they had knowledge of this condition so contained in the bill of lading. The bill of lading thus became a part of the contract, as a matter of law, between the railway company and the shipper. It does not seem to us that these facts can be reconciled, with fair dealing and justice, in any other way. It was a plain, simple, ordinary business transaction. There was no concealment or fraud or misleading about it, so far as we are able to discover. If it was applied to any other question except that of the liability of a common carrier, it would seem that there would be no question, but that if such a proposition were made and accepted the parties would be bound by it.

But common carriers may limit their liability, and in this case they undertook to do it, and adopted this means in lieu of a regular bill of lading. There is an Iowa case which seems to us directly in point and lays down the law as we understand it. The case is that of Wilde v. Transportation Co., 47 Ia. 272. The syllabus is:

"Where a common carrier upon the delivery of merchandise for transportation, issued to the consignor a shipping receipt which stated that the bill of lading would be issued upon application at a place designated therein, and that the merchandise would be transported subject to the conditions expressed in the bill of lading, *held*, that the bill of lading and not the shipping receipt embodied the contract of the parties, and that the consignee would be bound by the conditions expressed in such bill of lading."

The court say, in the opinion, on page 275:

"The consignors were notified that the contract was not the one which the law would imply from the simple delivery and receipt of the merchandise, but that it was to be such an one as should afterwards be embodied in a printed and written bill of lading. The consignors might have procured the bill of lading before the goods were shipped, or might have directed that the goods be not moved until the bill of lading had been procured. Then, if the terms contained in the bill of lading were

unsatisfactory or were not assented to they might refuse to make the shipment. But having permitted the goods to go forward under an agreement that the terms of shipment should be contained in a bill of lading, they, and the consignees whose agents for this purpose they are, must be bound by whatever terms are in good faith inserted in the bill of lading. There is here no evidence of bad faith. The bill of lading is proved to be in the form that defendants had for some time been in the habit of employing."

And they hold that the shipper there was bound by the conditions named in the bill of lading, and we think that the reasoning of that court is sound and that under the facts in this case the bill of lading became a part of the contract between these parties whether the shippers had notice and knowledge of these conditions in it or not.

The jury found that there was no negligence on the part of the railway company; that the goods were burned and that the railway company could not by the exercise of the highest degree of care have prevented their destruction. So that under this contract which we find existed between the railway company and the shipper, there being a finding by the jury that there was no negligence, the defendant was not liable for the loss of the goods, the bill of lading containing the condition that they would not be liable for fire, and the jury finding that they were not burned through their negligence.

In our judgment, therefore, the defendant below was entitled to have judgment in its favor notwithstanding the general verdict, upon these special findings of the jury; and, being of that opinion, the judgment of the court of common pleas will be reversed and set aside and judgment entered in favor of the plaintiff in error, defendant below, upon the special verdict of the jury, notwithstanding the general verdict.